Filed 3/5/13  S.B. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| S.B. et al.,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Real Party in Interest. | F066180<br><br>(Super. Ct. No. 516238)<br><br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann A. Ameral, Judge.

Nadine Salim, for Petitioner S.B.

Alistair Sheaffer, for Petitioner T.W.

No appearance for Respondent.

John P. Doering, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]     Before Wiseman, Acting P.J., Poochigian, J. and Peña, J.

Petitioners Terry (father) and S.B. (mother) seek an extraordinary writ (Cal. Rules of Court, rule 8.452) from the juvenile court's orders issued at a contested six-month review hearing (Welf. & Inst. Code, § 366.21, subd. (e))[1] terminating their reunification services and setting a section 366.26 hearing as to their one-year-old son, T.W. Father and mother contend they did not receive reasonable reunification services. Therefore, they further contend, the juvenile court erred in terminating their reunification services and setting a section 366.26 hearing. We disagree and deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

In mid-February 2012, mother gave birth to a son, T.W., the subject of this writ petition. During the pregnancy, mother regularly consumed alcohol and had syphilis, which she did not successfully treat. As a result, T.W. required intensive treatment for a variety of medical complications. However, mother and father did not appear to understand the severity of his medical problems. According to the hospital social worker, Tracy Kemp, they appeared delayed in their presentation and their responses seemed scattered and unclear. In addition, when the hospital staff expressed concern about T.W.'s condition, mother and father stated that "their baby was fine."

Kemp contacted the Stanislaus County Community Services Agency (agency) and emergency social worker Jorge Garcia met with mother and father at the hospital. They denied having any substance abuse problems or any criminal history. Mother disclosed, however, that four of her children were removed from her care in Sacramento County because her home was dirty and the children were eating off of the floor. In fact, mother's children were taken into protective custody in part because of her substance abuse. She was provided 12 months of reunification services but failed to complete them. In addition, mother has a criminal history of property crimes and disorderly conduct and father has a history of burglary, grand theft, false imprisonment and battery. In addition,

---

**1** All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

he and mother have a history of domestic violence. Notably, in February 2009, father grabbed mother by the neck and choked her when she tried to end their relationship. When she fell to the ground, he straddled mother and slapped her four times in the face. In June 2011, during an argument, father struck her in the right eye with his fist.

Father told Garcia that mother received Social Security Income (SSI) for a learning disability and that he had also received SSI in the past for a learning disability. Garcia informed the parents that the agency intended to take T.W. into protective custody.

The agency filed a dependency petition on T.W.'s behalf and in late February 2012, the juvenile court ordered him detained. The juvenile court also ordered the agency to refer mother and father for domestic violence, anger management, substance abuse and parenting services. In mid-March 2012, T.W. was discharged from the hospital and placed in foster care.

In its report for the jurisdictional hearing, the agency informed the juvenile court that mother and father wanted T.W. returned to their custody and expressed their willingness to participate in services. They frequently visited him while he was in the hospital and interacted lovingly during their visits with him at the agency. They had also taken steps to initiate their services. However, social worker Valerie Castro, author of the jurisdictional report, stated that T.W. was medically fragile and needed multiple followup appointments in multiple specialty clinics. Castro did not believe mother and father understood his fragile state. In addition, Castro had difficulty helping them understand their services requirements. She questioned whether their delay in understanding was related to a delay in cognitive functioning and/or comprehension or denial of T.W.'s medical condition.

In April 2012, the juvenile court conducted a combined jurisdictional/dispositional hearing (combined hearing). At the hearing, the juvenile court adjudged T.W. a dependent child, ordered him removed from mother and father's custody and approved a

3

reunification plan filed by the agency. The reunification plan required mother and father to complete assessments in domestic violence and anger management at Sierra Vista Child and Family Services (Sierra Vista) and follow any recommendations. It also required them to successfully complete a parenting education program at Sierra Vista. In addition, mother and father were required to complete outpatient substance abuse treatment, she at First Step Perinatal Program (First Step) and he at Nirvana Drug and Alcohol Institute (Nirvana). Both were required to submit to random drug testing.

At the combined hearing, the juvenile court also expressed concern that mother and father possibly suffered from cognitive delay and stated its desire that their reunification plans address any such delay. The juvenile court stated,

> "There [are] some concerns, but the [c]ourt doesn't have any basis to make a finding, based upon a preponderance of the evidence. But there [are] some current concerns about possible cognitive delays that the parents have. And so I want to make sure that the case plan addresses … any cognitive delays … , so they don't hamper the parents['] ability to successfully reunify."

The juvenile court then inquired, "[A]re there going to be any requests to make any amendments to the case plan?" Mother's attorney responded in the negative and father's attorney did not respond to the court's question.

The juvenile court also advised mother and father that their reunification services could be limited to six months and set a progress review hearing for July 2012 and the six-month review hearing for October 2012.

In June 2012, the agency filed an interim report informing the juvenile court that T.W. was placed with a maternal great aunt, Velma, in Stockton and was in fair condition. His eyes had not yet developed. He was completely blind in his right eye and 95 percent blind in his left eye.

The agency also reported that mother completed alcohol detoxification in early June 2012 and participated in one day of outpatient treatment. She was referred to First Step for outpatient treatment and to Redwoods for clean and sober living. She attended

4

one interim group at First Step and lived with her mother rather than in sober living. Father was admitted to Nirvana in early May 2012 for inpatient treatment. Upon his admission, he tested positive for marijuana. In early June, he tested positive for an illicit drug and was discharged from the program for being absent without leave. He returned to Nirvana near the end of June. Mother and father did not initiate any of their other services. Even though mother and father had not consistently utilized their services, the agency recommended that the juvenile court continue reunification services for them pending the six-month review hearing.

In July 2012, the juvenile court convened the interim review hearing and commented that mother and father did not appear to be making adequate progress. Mother's attorney said she thought mother had difficulty understanding and suggested that the agency review her services plan with her again. Father's counsel suggested the same for father. He also asked that the agency provide father transportation to T.W.'s medical appointments. Father said he wanted to participate in the medical appointments but was not offered transportation.

The juvenile court stated that the agency should be informing mother and father of the medical appointments but advised father that he needed to notify the agency in advance that he needed help getting to them. The juvenile court told him that if he got confused about his case plan, that he needed to let someone know. The court also confirmed the six-month review hearing set for October 2012.

In its report for the six-month review hearing, the agency recommended the juvenile court continue reunification services for mother and father. The agency reported that T.W. had multiple medical needs for which he was receiving specialty care. He had a "soft spot" on his forehead that had not closed and he was being referred to a neurologist for microcephaly. He saw an ophthalmologist every six months because of his blindness and an underdeveloped tear duct. T.W. also had asthma for which he saw an asthma specialist and had an appointment with a geneticist to assess him for fetal

5

alcohol syndrome.  He also suffered from growth retardation and was under the care of a cardiologist for anomalies of venous return.  He was evaluated by a gastroenterologist for difficulty feeding and gaining weight and was being followed for a swallow dysfunction. Velma told the social worker that she administered T.W.'s asthma treatments and that he required around-the-clock supervision as he only slept 30 minutes at a time.  The social worker was impressed with how well Velma was attending to T.W.'s medical needs.

The agency reported that mother began Phase I at First Step in late July 2012 and was making progress.  She regularly attended group sessions, shared in group and turned in a journal.  She was also participating in the First Step parenting program and was attentive in group sessions but reportedly needed to share more.  She tested positive for benzodiazepine twice in June but subsequently tested negative.  She was not participating in domestic violence and anger management counseling.

The agency also reported that father tested negative for drugs in June and July 2012, but was discharged from Nirvana a third time in July 2012 for violating the program rules.  In late July, he was admitted to Nirvana for the fourth time, but discharged a month later for not complying with the rules and guidelines.  The discharge report noted he did not attend all of the outside Alcoholics/Narcotics Anonymous (AA/NA) meetings and forged his signature on the meeting slips.  In mid-September, father entered Stanislaus Recovery Center Outpatient Program.  In addition, father completed seven parenting sessions and in mid-September 2012 attended his first anger management/domestic violence assessment appointment.

Though the agency recommended the juvenile court continue reunification services, it was dubious that mother and father could reunify with T.W. given their lack of consistency in their case plan participation and their continuing minimization of his special medical needs.  When questioned about T.W.'s disabilities, mother and father stated he was healthy and had no medical problems.  When the social worker pointed out he was blind in one eye and nearly blind in the other, they denied he had any problems

6

with his eyes. They said he could see well but would need to wear glasses. They said T.W. could follow their fingers with his eyes.

In October 2012, the juvenile court convened but continued the six-month review hearing as the agency wanted to change its recommendation. In an addendum report, the agency recommended the juvenile court terminate mother and father's reunification services because father was at risk of being discharged from Nirvana for lack of attendance and participation, and mother had not completed a domestic violence/anger management assessment. The agency opined that if mother and father could not meet their responsibilities, they could not effectively manage T.W. and his special medical needs.

In late October 2012, the juvenile convened a contested six-month review hearing, which spanned four sessions and concluded in November. Mother and father's position at the hearing was that the agency failed to provide them reasonable services because the social worker did not inform them of T.W.'s medical appointments and their case plan did not accommodate their cognitive difficulties. Therefore, they argued, the juvenile court should continue reunification services. In addition, they took the position that they made substantive progress toward reunification and there was a substantial probability T.W. could be returned to their custody if services were continued.

During the course of the proceedings, Sierra Vista social worker Melissa Hale faxed the agency a letter regarding father's progress in domestic violence/anger management counseling at Sierra Vista. She stated that he was eager to reunify with T.W. but had difficulty providing her information to thoroughly assess him. He told her about his learning disability and having sustained a brain injury that left two bullets lodged in his head. He told her that he suffered from "black outs" after prolonged sun exposure. Ms. Hale questioned what effect father's brain injury had on his overall functioning and recommended that the agency refer him for a neuropsychological evaluation to determine his ability to reunify with T.W.

Social worker Beth Morrison testified that she was the supervising social worker on mother and father's case since August 2012. Prior to that, social worker Pedro Rodriguez was assigned the case. He was no longer employed by the agency. Morrison asked mother and father if they had problems with comprehension. Both denied having such a problem and said they were able to read their program materials. Morrison also asked the staff at First Step if mother had difficulty reading and writing and/or understanding medical documentation and instructions and was told that she did not.

On cross-examination, father's attorney questioned Morrison about an entry in the services log book dated August 15, 2012. Social worker Rodriguez made the entry to document a contact from a Nirvana staff member stating that father turned in his AA/NA card with two forged signatures. When confronted, father first denied forging the signatures. He later disclosed that he forged them because he felt pressured to complete the meetings. The staff member felt that father may have a mental disorder that impeded his substance abuse recovery. Morrison was asked whether father was referred for any services to address a possible mental disorder. She stated that he had not been. Morrison also testified that father had not been discharged from Nirvana for problems related to his comprehension. Rather, his discharges were the result of noncompliance. She said father never told her that he was shot in the head.

Morrison further testified that, to her knowledge, mother and father were not notified of T.W.'s medical appointments between April and August 2012, when she took over the case.

Velma testified that she took T.W to all of his doctor's appointments and that she notified the social worker in advance of the appointments. She also informed mother whenever mother called her. However, she said mother and father's telephone did not always work so she did not tell them about every appointment. She told them about two eye appointments in July and they accompanied her to an eye appointment in August.

8

She also told them about a nutrition appointment in August. She said they never asked her about upcoming appointments or how to take care of T.W.

Father testified and denied forging his AA/NA attendance cards. He said he was never diagnosed with a mental disorder and denied have a learning disability. He also said he did not have difficulty understanding the materials. He said he was aware of T.W.'s medical needs. He knew T.W. was blind in one eye, virtually blind in the other, and had asthma. Father said he did not go to T.W.'s medical appointments because Rodriguez would not arrange transportation. He also testified that Rodriguez did not notify him of T.W.'s appointments and that he was not told of appointments before August 9, 2012.

Father also testified about his head injury. He said someone tried to rob him, shot him five times in the head, and stabbed him 37 times when he was 14 years old. Two of the bullets remained in his head. He said the bullets did not affect him but that sometimes when he sat too long and then got up, he became dizzy. He said he told Morrison that he had bullets in his head but she did not listen.

Father denied having anger management problems and denied assaulting mother in June 2011. He also denied needing substance abuse treatment but said he would participate in anger management and substance abuse treatment if the juvenile court continued his services.

Father testified that it would not be difficult to take care of T.W. Asked whether he thought it was important to get information about T.W. and his medical care, father stated that he already knew about it because he listened to what the doctor said. He had attended five appointments. He believed he had all the medical information he needed to take T.W. home that day.

Mother also testified that she did not have problems understanding the material. She said she and father called Velma every day when their phone was working. She said Velma told her about T.W.'s appointments from the time he was placed with her. She

9

said she did not go to the earlier appointments because she did not have a ride and Rodriguez told her that he could only arrange transportation for Velma and T.W. She said Morrison helped her get to the appointments.

Mother denied having a problem with alcohol even though she testified she used alcohol daily while pregnant with T.W. She denied there were problems with domestic violence in the home or that she needed domestic violence counseling. She denied father choked her in 2009, but acknowledged that he hit her in the right eye with his fist in June 2011.

Mother also believed she was ready to take care of T.W. without any help. She knew that he was very sick, had asthma, and "something with his head" and "his eyes." No one had shown her a list of T.W.'s medications or shown her how to use his nebulizer.

At the conclusion of the hearing, the juvenile court found the agency provided mother and father reasonable services and there was not a substantial probability T.W. could be returned to their custody. In ruling, the juvenile court expressed its concern with mother and father's denial, citing father's denial of his anger management problem, mother's denial of her alcoholism and both of their denial about their domestic violence. The juvenile court believed that Rodriguez did not tell them about the medical appointments and stated that if their inability to address T.W.'s medical needs were the only problem, it would continue reunification services. However, the fact that they denied obvious problems demonstrated they had not made substantive progress or regularly participated in their services plans, nor did it bode well for future participation. Consequently, the juvenile court found it would not be in T.W.'s best interest to continue services and set a section 366.26 hearing. This petition ensued.

**DISCUSSION**

Mother and father contend the agency failed to provide them reasonable services because the services offered did not address their cognitive delays or their need to learn about T.W.'s medical problems and needs. We disagree.

When, as here, a child is younger than three years old on the date of initial removal from the parent's physical custody, reunification services are presumptively limited to six months. (§ 361.5, subd. (a)(1)(B); *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843.) At the six-month review hearing in such a case, the agency has the burden of proving, by clear and convincing evidence, that it offered or provided reasonable services to reunify the family. (§ 366.21, subd. (e).) If the juvenile court finds the parent was provided reasonable services but failed to participate regularly and make substantive progress in a court-ordered plan, the juvenile court may terminate reunification services and set a section 366.26 hearing. (§ 366.21, subd. (e).) If, however, the juvenile court finds reasonable services were not offered or provided or there is a substantial probability the child could be returned to parental custody with continued services, it must continue the case to the 12-month review hearing. (*Ibid*.)

On a challenge to the juvenile court's reasonable services finding, we view the evidence in a light most favorable to the agency, indulging in all legitimate and reasonable inferences to uphold the finding. (*In re Misako R*. (1991) 2 Cal.App.4th 538, 545.) If substantial evidence supports the juvenile court's finding, we will not disturb it. (*Ibid.*) Moreover, under our review, services need not be perfect to be reasonable. Rather, the "standard is ... whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) Since mother and father bear the burden of demonstrating error on appeal (*Winograd v. American Broadcasting Co*. (1998) 68 Cal.App.4th 624, 632), they must show that the juvenile court's reasonable services finding is not supported by substantial evidence. We conclude they failed to meet their burden.

11

With respect to cognitive delay, there may have been suspicion but there was no evidence that mother and/or father suffer from it. They both denied having any difficulty understanding their course materials and father denied having a learning disorder and/or mental disorder. Further, the juvenile court inquired if counsel wanted the case plan amended to address any cognitive delay and neither mother nor father's attorney requested a revised case plan then or thereafter. Consequently, mother and father accepted their case plans as they were written and cannot now claim that they were unreasonable in content. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 47.)

With respect to T.W.'s medical appointments, the juvenile court concluded that Rodriguez did not inform mother and father of them while he was assigned their case. However, the juvenile court did not believe that Rodriguez's failure to inform them rendered their services unreasonable and we agree. Mother and father had serious problems with substance abuse and domestic violence for which they were provided services. However, they did not regularly participate in their services and denied having such problems. Consequently, the juvenile court found they made limited progress. In addition, mother and father did not fully understand the severity of T.W.'s medical condition and mistakenly believed they were capable of taking over his care. Had their inability to take care of T.W. been the only obstacle to eventual reunification, their inability to participate in T.W.'s medical appointments would have been more significant. However, given their general denial and lack of progress, that one failure on the part of the agency did not in this case render services unreasonable.

In support of their contention that they were denied reasonable services, mother and father cite *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*), a case involving developmentally disabled parents whose reunification services were terminated at the 18-month review hearing. (*Id.* at pp. 1419-1423.) In *Tracy J.*, the appellate court concluded the agency did not provide the mother services designed to address her physical disabilities, unnecessarily limited visitation, did not inform the parents of their

12

child's medical appointments in advance, and did not instruct them on how to treat their child's asthma. (*Id*. at pp. 1426-1427.) As a result, the appellate court issued a writ of mandate directing the juvenile court to vacate its reasonable services finding. (*Id*. at p. 1428.)

*Tracy J*. is unavailing for two reasons. Mother and father cite the case but do not explain how it supports their contention. More importantly, *Tracy J*. is distinguishable on its facts. In *Tracy J*., the parents, unlike mother and father, had known disabilities and fully complied with their services plans. (*Tracy J*., *supra*, 202 Cal.App.4th at pp. 1419-1420.)

We find no error on this record and deny the petition.

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is final forthwith as to this court.